AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  3:23-sw-84 |
| Purple Apple iPhone 12, IMEI 355541829096530, located at the ATF Richmond I Field Office | ) ) | |

FILED

JUN - 2 2023

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(a)(6); 924(a)(1)(A); 922(d)(1); 371 | Providing false or fictitious information to federal firearms licensee; Providing firearm to prohibited person; Conspiracy |

The application is based on these facts: See Affidavit in Support of an Application for Search Warrant

Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

James H. Reisch, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  JUNE 2, 2023

City and state:  Richmond, Virginia

/s/ MRC
_____
Mark R. Colombell
United States Magistrate Judge
*Judge's signature*

Honorable Mark R. Colombell
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

IN THE MATTER OF THE SEARCH OF:

PURPLE APPLE IPHONE 12
IMEI: 355541829096530,
CURRENTLY LOCATED AT:

Case No.  3:23sw84

ATF – RICHMOND I FIELD OFFICE
1011 BOULDER SPRINGS DRIVE
SUITE 301
N. CHESTERFIELD, Virginia 23225



**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

Your affiant, James H. Reisch, being first duly sworn, hereby deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    Your affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.  In summary, your affiant is investigating the illegal trafficking of firearms and their use in violent crimes.

2.    Your affiant has identified at least four (4) recipients of firearms that were originally purchased by Joshua James Taylor GARY (hereinafter "GARY") — and now seeks permission to search the cellular telephone (hereinafter "TARGET DEVICE") that was in GARY's possession during his non-custodial interview with your affiant and the Virginia Department of State Police (hereinafter "VSP"), Firearms Unit Trooper Mark Porter on May 22, 2023.  Based

upon the information below, your affiant submits that GARY used the TARGET DEVICE, committing several federal offenses in the process.

3.      Your affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and has been so employed since May of 2015.  Your affiant is currently assigned to the Richmond I Field Office, within the Washington Field Division.  Your affiant is a graduate of the Federal Law Enforcement Training Center's Basic Criminal Investigator Program and the ATF's Special Agent Basic Training Program.

4.      Prior to your affiant's employment with ATF, your affiant was a sworn law enforcement officer with the Virginia Department of State Police for ten (10) years.  Your affiant spent four (4) years assigned to the Bureau of Criminal Investigation, General Investigation Section, Violent Crime Unit.  This assignment, as well as your affiant's previous six (6) years as a uniformed Virginia State Police Trooper, afforded your affiant the opportunity to investigate and/or arrest and prosecute hundreds of individuals, for violent crimes, white collar crimes, cyber, threats of death or bodily harm against persons, and numerous other criminal offenses in violation of the Code of Virginia and the United States Code.

5.      Your affiant has attended training programs related to the investigation of homicide, child abduction, child death, serial killers, criminal profiling, statement analysis, interview and interrogation, hostage negotiation and crime scene forensics.  Your affiant attended these schools through courses offered by the Virginia State Police, the Virginia Department of Forensic Science, the Virginia Department of Corrections, the Federal Bureau of Investigation, the Delaware State Police Homicide Unit, and the International Association of Homicide Investigators.

2

6.     Your affiant has been called to testify in multiple districts of the United States District Court, multiple jurisdictions across the Commonwealth of Virginia and the State of Delaware involving the aforementioned violations of law. Your affiant has participated in the preparation and execution of numerous arrest and search warrants for criminal offenses involving violations of the criminal code of Virginia, as well as United States Code.

7.     Your affiant is a forensic crime scene technician and a graduate of the 85th Session of the Virginia Department of Forensic Science Academy, a Crisis Negotiator, and Police Shooting Investigator.

8.     Your affiant has extensive experience in firearms and drug investigations. Your affiant has seized over 250 firearms and interdicted countless others bound for illegal domestic and international trafficking. Your affiant has interviewed over 200 drug users and approximately 100 drug dealers in your affiant's career. Your affiant has worked on two (2) Federal and one (1) State wiretap investigations. Your affiant has participated in over 200 controlled purchases of drugs, predominately cocaine, crack cocaine, and heroin. Your affiant has also listened to over 500 conversations about drugs. Thus, your affiant is familiar with the coded/cryptic way in which firearms and drug dealers talk about firearms and drugs.

9.     GARY is suspected of violating 18 U.S.C. §922(a)(6)—Providing false or fictitious information to a federal firearms licensee during the acquisition of a firearm; 18 U.S.C. §924(a)(1)(A)—Knowingly making any false statement or representation with respect to the information required by this chapter to be kept in the records of a federal firearms licensee; 18 U.S.C. §922 (d)(1)—Providing a firearm to a prohibited person; and 18 U.S.C. § 371—Conspiracy to commit violations of 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 922(d)(1) (hereinafter the "SPECIFIED FEDERAL OFFENSES").

3

10.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of your affiant's knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

11.    The property to be searched, the TARGET DEVICE, is a purple in color Apple iPhone 12, which, as discussed below, was seized during a non-custodial interview of GARY (described in Attachment A and incorporated herein).  The TARGET DEVICE is currently located at the ATF Richmond I Field Office, 1011 Boulder Springs Drive, Suite 301, N. Chesterfield, Virginia.

12.    The applied-for warrant would authorize the forensic examination of the TARGET DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B (incorporated herein by reference).

13.    Your affiant affirms that the facts of this affidavit establish that there is probable cause to believe that the TARGET DEVICE contains evidence of violations of the SPECIFIED FEDERAL OFFENSES.

## SPECIFIED FEDERAL OFFENSES

14.    This investigation concerns alleged violations of the following:

a.    18 U.S.C. § 922(a)(6) - which prohibits any person from providing false statements or representations to a federal firearms licensee during the acquisition of a firearm.

b.    18 U.S.C. § 924(a)(1)(A) - which prohibits any person from knowingly making any false statement or representation with respect to the information required by this chapter to be kept in the records of a federal firearms licensee.

4

    c.  18 U.S.C. § 922(d)(1) - which prohibits any person from providing firearms or ammunition to any person previously convicted in any court of, a crime punishable by imprisonment for a term exceeding one year.

    d.  18 U.S.C. § 371 – an agreement between two or more individuals to commit a crime—here, 18 U.S.C. §§ 922(a)(6) and 922(d)(1).

**TECHNICAL TERMS**

    15.    Based on my training and experience, your affiant uses the following technical terms to convey the following meanings:

    a.  **Smartphone:** A portable personal computer with a mobile operating system having features useful for mobile or handheld use.  Smartphones, which are typically pocket-sized (as opposed to tablets, which are larger in measurement), have become commonplace in modern society in developed nations.  While the functionality of smartphones may vary somewhat from model to model, they typically possess most if not all of the following features and capabilities: 1) place and receive voice and video calls; 2) create, send and receive text messages; 3) voice-activated digital assistants (such as Siri, Google Assistant, Alexa, Cortana, or Bixby) designed to enhance the user experience; 4) event calendars; 5) contact lists; 6) media players; 7) video games; 8) GPS navigation; 9) digital camera and digital video camera; and 10) third-party software components commonly referred to as "apps." Smartphones can access the Internet through cellular as well as Wi-Fi ("wireless fidelity") networks.  They typically have a color display with a graphical user interface that covers most of the front surface of the phone and which usually

functions as a touchscreen and sometimes additionally as a touch-enabled keyboard.

b. **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

c. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

16.    Based on my training, experience, and research I know that the SUBJECT DEVICE has capabilities that allow it to access the internet and serve as a smartphone.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17.    Based on my knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

18.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

7

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

19.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

20.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## PROBABLE CAUSE

### A.    GARY's Firearms Purchases

21.    In early May of 2023, your affiant was provided information by the ATF Washington Crime Gun Intelligence Center about an extensive number of firearms purchases conducted by GARY in the past fourteen (14) months.  A compilation of this intelligence uncovered that GARY had purchased twenty-one (21) firearms between July 1, 2022, and May 7, 2023.  GARY had previously purchased two (2) firearms in February and March of 2022. Accordingly, as of May 7, 2023, GARY had purchased a total of twenty-three (23) firearms.  This intelligence led your affiant to conduct a query of the ATF's e-Trace database that chronicles the recovery of firearms in crimes and documentation of the multiple sale of firearms.  These queries

8

uncovered two (2) firearms purchased by GARY in 2022 that were recovered with short time-to-crimes (hereinafter "TTC"); a measure quantifying the amount of time between the purchase of the firearm and its recovery in a crime. Each of these two (2) recoveries were under eighty-five (85) days from the time of purchase. These queries further showed that GARY had made four (4) "multiple sales"—purchases of more than one (1) firearm within a five (5) day period.

22.    The short TTCs led your affiant to query those firearms in the ATF, NIBIN Enforcement Support System (hereinafter "NESS"), a clearinghouse for all submitted cartridge casings recovered during firearms seizures and at crime scenes. NESS indicated that one (1) of the two (2) traced firearms had been used in a shooting in the City of Richmond just sixteen (16) days after it was purchased by GARY.

**B.    GARY's Firearms Traces**

23.    The ATF e-Trace query results for these two (2) firearms purchased by GARY with short TTCs are detailed below:

   a. Firearms Trace #T20220585453, Glock 26, 9mm pistol, serial number: AGKD074
        1. Purchased – September 15, 2022, at Green Top
        2. Recovered – November 30, 2022, in the City of Richmond during a traffic stop
        3. Possessor – Jhalil Junmaine LANE (hereinafter "LANE") is a two (2) time convicted felon and a validated member of the Crips criminal street gang.
        4. Time to Crime: 76 days

   b. Firearms Trace #T20230027699, Glock 22, .40 caliber pistol, serial number: XHT602
        1. Purchased – October 22, 2022, at Green Top
        2. Recovered – January 14, 2023, in the City of Richmond during a traffic stop
        3. Possessor – Dominique Ramont HODGE (hereinafter "HODGE").
        4. Time to Crime: 84 days

9

      5.Crime Gun ID # 768-23-000298 indicated that the firearm was used to shoot into an occupied dwelling on November 7, 2022, just sixteen (16) days after its purchase

24.     Your affiant noticed a trend in GARY's purchases, specifically that the majority were all conducted at one (1) federal firearms licensee (hereinafter "FFL") – Green Top Sporting Goods (hereinafter "Green Top").

25.     Your affiant requested copies of GARY's ATF Form 4473 for the over the counter sale of firearms (hereinafter "4473") and invoices for all purchases from Green Top. Through the information on these invoices your affiant computed that in this ten (10) month period between July 1, 2022 and May 7, 2023, GARY spent over $9,000 on firearms. That total does not include purchases of ammunition and firearms accessories.

26.     Your affiant obtained Virginia Employment Commission information and found that GARY has not been gainfully employed since the 3rd quarter of 2022 where he earned $286.57 from Amazon and a combined $9,732.75 for the 2nd and 3rd Quarter of 2022 from Universal Protection Service LLC. No wages for the 4th quarter of 2022 or the 1st quarter of 2023 were found.

27.     Your affiant submits that based upon GARY's employment history, he does not have the disposable income to purchase over $9,000 in firearms in a ten (10) month period without the financial assistance of others. This further limits any possibility that GARY was providing the firearms as gifts to others. Without the apparent financial stability to purchase the firearms himself, GARY is not likely in a position to gift over $9,000 in firearms.

28.     Your affiant attests that GARY's violation of 18 USC § 922(a)(6) occurred in multiple forms. Most notably and for the purposes of this affidavit, GARY violated 18 USC § 922(a)(6) by purchasing firearms for persons other than himself.

29.     The likelihood that GARY was not the actual buyer is evident in the previously-described seizure of two (2) of his firearms during police involved incidents.  Each of these recoveries were from prohibited persons.  Section B, Question 21(a) of the 4473 reads, "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) [ATF Form 5300.9A]? **Warning:  You are not the actual transferee/buyer if you are acquiring any of the firearm(s) on behalf of another person.  If you are not the actual transferee/buyer, the licensee cannot transfer any of the firearm(s) to you.**"  The 4473 requires the purchaser to provide an affirmative answer in order to effect the purchase.  Had these purchases been for GARY, he likely would then have reported those two (2) firearms as stolen, yet as of the date of this affidavit, none of the firearms purchased by GARY have been reported stolen.

30.     Between July 1, 2022 and May 7, 2023, GARY completed nineteen (19) 4473s.  On December 27, 2022, January 11, 2023, January 26, 2023, and March 3, 2023, GARY completed a single 4473 corresponding to the purchase of two (2) firearms.  Accordingly, although GARY purchased 23 firearms during this ten (10) month period, he only completed nineteen (19) 4473s.  On each of these 4473s, GARY answered affirmatively that the firearm or firearms being purchased were for himself.  It is important to note that a negative response to Question 21(a), regardless of intent, would result in a cancellation of the sale and the background check process as required by State and Federal law.

**C.     GARY's Attempted Purchases**

31.     On May 12, 2023, your affiant made contact with the VSP Firearms Transaction Unit (hereinafter "FTU") and requested that a delay be placed on GARY due to the ongoing investigation into his large quantity of firearms purchases.  A delay causes all attempted firearms

11

purchases to be delayed and the requesting law enforcement member to be notified of the attempted purchase. This tool is used to aid law enforcement in their investigation of potential straw purchases and limit the amount of firearms entering the stream of commerce once these subjects are identified.

32.    On May 18, 2023, your affiant was alerted by the VSP FTU that, in relation to the delay, GARY had attempted to make the purchase of a firearm at the Bass Pro Shop in Ashland, Virginia, on May 17, 2023. Your affiant, along with VSP Firearm Unit Troopers, attempted to make contact with GARY at his last known address. Your affiant could not locate GARY.

33.    Due to internal VSP FTU policies, delayed transactions are released after three (3) days. Accordingly, on May 20, 2023, GARY was able to obtain the firearm that he originally attempted to purchase on May 17, 2023. This purchase brought his total purchases to twenty-four (24) firearms.

34.    On May 21, 2023, your affiant was again contacted in relation to the delay by the VSP FTU and alerted that GARY was attempting to purchase yet another firearm at Bass Pro Shop. After learning of the ATF's investigation into GARY's recent firearms purchases, Bass Pro Shop management chose to deny the sale and no transfer occurred.

35.    GARY completed two (2) additional 4473s corresponding with this twenty-fourth (24th) purchase and additional attempted purchases between May 17 and May 21, 2023. On each of these 4473s, GARY answered affirmatively that the firearm or firearms being purchased were for himself.

12

**D.**     **Video Surveillance from FFLs**

36.     Your affiant obtained video surveillance from firearm purchases made by GARY at Green Top on March 3, 2023, and April 28, 2023. During the March 3, 2023, purchase an unknown black male (hereinafter "UNSUB") entered the business minutes before GARY.

 

37.     Above, UNSUB is pictured on the left and GARY is pictured on the right. The two (2) do not interact during the transaction however GARY could be seen holding his cellular telephone to his ear as if speaking to someone on the other end. As seen on the next page, he was also seen manipulating his cellular telephone in a manner consistent with sending SMS messages. The UNSUB was not visible on the surveillance video while GARY is appearing to use his cellular phone.

13

 

38.    Once the purchase was complete GARY joined with UNSUB and they proceeded to the exit together.



39.    During GARY's April 28, 2023, purchase he appeared to be alone, however, as seen below, he could be seen manipulating his cellular telephone in the same manner.

14



4-28-2023 13:08:54

40.    Your affiant obtained video surveillance from a firearms purchase made by GARY on May 7, 2023, at Dance's Sporting Goods (hereinafter "Dance's").  GARY was present with a subject your affiant knows to be his girlfriend, Jayla Chante JOHNSON (hereinafter "JOHNSON").  Screen captures from the Dance's surveillance video were compared to JOHNSON's Virginia Department of Motor Vehicles (hereinafter "DMV") photograph.  The subject in both photographs was the same person.

41.    On May 24, 2023, your affiant was contacted by Green Top and informed that GARY had been in Green Top on May 21, 2023, before he had been denied at Bass Pro Shop. GARY attempted to purchase the same firearm, a Ruger 57, 5.7x28 mm pistol, at both stores. Green Top employees showed your affiant video surveillance of GARY, JOHNSON and UNSUB standing at the firearms counter on May 21, 2023.

42.    Green Top employees ultimately turned GARY and JOHNSON away because they believed the purchase to be for someone else.  The employees explained that they

15

overheard a conversation between JOHNSON and GARY about who was going to purchase the firearm. JOHNSON stepped forward but stated that she did not have her identification with her. GARY then indicated he would purchase the firearm. The employees stopped the purchase and the trio left the store. They indicated that UNSUB had previously been banned from the business for stealing ammunition.

**E.    Interview of GARY**

43.    On May 22, 2023, your affiant and VSP Firearm Unit Troopers made contact with GARY at his mother's residence.

44.    Your affiant responded to the last known address for GARY in the County of Henrico. Your affiant and VSP Troopers made contact with GARY's mother, who in turn contacted him and instructed him to come to her residence.

45.    Your affiant obtained background information from GARY to include his current address, employment and earnings. He indicated that his current address was his mother's, that he wasn't currently employed, and that he has made money working security jobs.

46.    GARY stated that he no longer lived at the address that he had written on each of the last fifteen (15) 4473s since September of 2022.

47.    Your affiant questioned where GARY's firearms were. He stated that they were all stored in a safe at his "Uncle's" residence, however he could not recall the exact address of this "Uncle," or his actual name. GARY attempted to place a call to "Uncle" while the TARGET DEVICE was on speakerphone. However, the call went unanswered. GARY informed your affiant that "Uncle's" real name was "Stevens Chris." Following the failed

16

telephone call, GARY stated that there was no other way for him to gain access to his firearms while "Stevens Chris" was at work.

48.    GARY repeatedly provided conflicting statements during the nearly hour and a half interview. Your affiant attempted to place a telephone call to the number GARY provided for "Stevens Chris," (804) 928-2318. This telephone call went to voicemail and your affiant left a vague message instructing the possessor of the telephone to call back.

49.    Your affiant requested to see GARY's cellular telephone; the TARGET DEVICE. He verbally consented after a conversation with his mother. GARY handed the TARGET DEVICE to your affiant. When GARY handed the TARGET DEVICE to your affiant, the TARGET DEVICE was unlocked and a list of recent calls was visible on the screen. Your affiant took a photograph of the recent call list. Your affiant provided GARY with an ATF Consent to Search, which was read aloud and GARY willingly signed.



17

50.    Your affiant began an onsite preview of the TARGET DEVICE and looked closer at GARY's recent calls. Between the time when GARY's mother contacted GARY and instructed him to come to her residence and when your affiant conducted an onsite preview of the TARGET DEVICE, GARY had attempted and/or completed at least twelve (12) telephone or Facetime calls with three (3) specific people – "C3," "Chris," and +1 (804) 928-2318. The last being the number he had provided for "Stevens Chris." GARY elaborated that both "C3 and Chris" were his cousins and "Stevens Chris'" sons. GARY's mother was adamant that GARY was not blood relatives with any of the people he had mentioned to your affiant.

51.    Your affiant then went to GARY's CashApp application and preliminarily discovered three (3) transactions that mirrored his purchases of firearms. A credit would appear in his account totaling a sum just over the purchase price of the firearm(s) and then a debit would be made to the corresponding FFL that GARY purchased from on that date. Screenshots for the April 28, 2023, and May 7, 2023, purchases are below.



52.     Your affiant went to the TARGET DEVICE's Contacts and obtained (804) 802-2409 as the telephone number associated with "C3." Your affiant informed GARY that he was stopping his search and was seizing the TARGET DEVICE in anticipation of a search warrant based upon the uncovered evidence. GARY was provided with a copy of an ATF property receipt for the TARGET DEVICE.

**F.     Number Intelligence**

53.     Following conclusion of the interview your affiant conducted various open source and law enforcement queries to identify the subjects associated with the telephone number +1 (804) 928-2318 and the telephone number for "C3," (804) 802-2409. Your affiant identified the subscriber of (804) 928-2318 as Integrity Protection Services and the user as Javon Elias ISRAEL, aka Hasan Muhammad ISRAEL. ISRAEL is a "validated" member of the Crip criminal street gang according to the Virginia Department of Corrections' Gang validation process and a thirteen (13) time convicted felon. ISRAEL was just discharged from the Commonwealth of Virginia Department of Corrections, Probation & Parole, District 32 on February 13, 2023. The telephone number had no correlation to anyone with any derivation of the name "Stevens Chris."

54.     The same queries were conducted on the telephone number for "C3," (804) 802-2409, and uncovered that it was associated with Christian Rashad BAUGH (hereinafter "BAUGH") as recently as April of 2023, in a Henrico Police Department report. Your affiant obtained a DMV photograph for BAUGH and provided it to the employees at Green Top. They confirmed that the subject depicted in the DMV photograph was the same subject who had been

19

banned from their store and was present with GARY on May 21, 2023. This further confirmed that identity of UNSUB as BAUGH.

55.    On May 24, 2023, your affiant conducted a law enforcement query for derivations of "Stevens Chris." Your affiant uncovered a subject named Ondoua Ntolo STEVENS CHRIS (hereinafter "SC") who lived at an address consistent with the location GARY had described – in the area of the DMV off Brook Road. Contact has not been made SC because your affiant is unaware of his actual involvement or exposure in this investigation.

**G.    Apple Quick Start, iCloud, and Google Backups**

56.    Your affiant submits that with Apple devices supporting Apple iOS 12.4 or later, a new iPhone set up option was made available to users. This new data migration is available when transitioning from an older Apple iPhone to a new Apple iPhone.

      a.    As part of Quick Start, users can now transfer data directly, without requiring the use of iCloud or an iTunes backup. The Apple iPhone defaults to using local WiFi, but you can transfer wired using the USB3 Camera Adapter and a Lightning cable.

      b.    To utilize the new Apple iPhone set up option, both the new factory-reset iPhone and your existing iPhone must be running Apple iOS 12.4 or later. Apple iOS 12.4 was released on July 22, 2019. Beginning in August of 2019, all new Apple iPhones were sold with Apple iOS 12.4 or later preinstalled, and therefore iPhone data migration became possible. Additional details of this form of data migration are available at https://support.apple.com/en-us/HT210216.

57.    Your affiant submits that regardless of the previous Apple cellular devices utilized by GARY, he had multiple options of restoring his data to his new device, referenced

across this affidavit as the TARGET DEVICE. Whether he utilized Apple's Quick Start, a previous iCloud backup, a Google backup or a combination of any of the three (3) would only cause to provide additional data that is the target of this affidavit from the cellular device that was in his possession at the time of the suspected straw purchasers. Furthermore, the number of target devices that GARY utilized between the onset of his firearms purchases in February of 2022, until the date of the seizure of the TARGET DEVICE only serves to add additional data because that data and any additional data created by each of the subsequent devices leading up to the TARGET DEVICE would be made available through Apple's backup and migration outlets.

58.     In effect, the data of evidentiary value to this investigation may have originated on other devices that were then migrated into any subsequent device ending up on the TARGET DEVICE seized on May 22, 2023.

## CONCLUSION

59.     Based on the information above, your affiant submits that GARY worked with others to take part in the illegal trafficking of firearms from Green Top and Dance's into the Commonwealth of Virginia and that there is additional information – from what has already been located – within the TARGET DEVICE, including but not limited to text messages and call logs, that will be helpful in identifying the other people involved in this conspiracy. Furthermore, your affiant submits that because only two (2) of the twenty-four (24) purchased firearms have been recovered to date, and none have been reported stolen; GARY likely used the TARGET DEVICE to coordinate the sale or movement of the remaining firearms prior to his interview with your affiant.

21

60.     Based upon your affiant's training and experience, firearms traffickers will carry cellular devices in order to communicate with sources of supply, co-conspirators and customers. The sale, transfer and theft of the firearms typically involve a cellular telephone such as the TARGET DEVICE, and therefore the forensic extraction of the TARGET DEVICE will likely uncover conversations, photographs, video, and other data that aids law enforcement in the apprehension of co-conspirators and the recovery of the remaining twenty-two (22) firearms.

61.     Your affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

James H. Reisch
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me
on the 2nd day of June 2023.

_____
UNITED STATES MAGISTRATE JUDGE

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

22

## ATTACHMENT A

1.      The property to be searched is a PURPLE APPLE IPHONE 12 CELLULAR TELEPHONE, IMEI: 355541829096530 (hereinafter "TARGET DEVICE") seized during the interview of Joshua James Taylor GARY on May 22, 2023. The TARGET DEVICE is currently located at the ATF Richmond I Field Office, 1011 Boulder Springs Drive, Suite 301, N. Chesterfield, Virginia.

2.      This warrant authorizes the forensic examination of TARGET DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

23

## ATTACHMENT B

1.      All records on TARGET DEVICE described in Attachment A that relate to violations of 18 U.S.C. §922(a)(6)—Providing false or fictitious information to a federal firearms licensee during the acquisition of a firearm; 18 U.S.C. §924(a)(1)(A)—Knowingly making any false statement or representation with respect to the information required by this chapter to be kept in the records of a federal firearms licensee; 18 U.S.C. §922 (d)(1)—Providing a firearm to a prohibited person, and 18 U.S.C. § 371—Conspiracy to commit violations of 18 U.S.C. §§ 922(a)(6), 922(d)(1) (hereinafter the "SPECIFIED FEDERAL OFFENSES") and involve Joshua James Taylor GARY from February 24, 2022, to present unless otherwise noted, including:

a.  Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to violations of one or more of the "SPECIFIED FEDERAL OFFENSES";

b.  Images, pictures, photographs, videos, or other visual depictions sent or received by TARGET DEVICE regardless of the underlying program used to create, store, send, or receive such depictions relating to violations of one or more of the "SPECIFIED FEDERAL OFFENSES";

c.  GPS data showing the location and movement of TARGET DEVICE from February 24, 2022, to present;

d.  Bank records, checks, credit card bills, account information, and other financial records related to violations one or more of the "SPECIFIED FEDERAL OFFENSES";

e.  The content of any and all text messages or instant messages sent or received by the TARGET DEVICE regardless of the underlying program used to send and receive those messages relating to violations of one or more of the "SPECIFIED FEDERAL OFFENSES;"

      f.   Any and all call logs, regardless of the underlying program used to send and receive those calls; and

      g.   Contact lists, regardless of the underlying program used to store those contacts and regardless of when the contacts were created.

    2.      Evidence of user attribution showing who used or owned TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history—regardless of when the data was created or the text messages were sent.

    3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.